Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

Richmond Division

|  |  |
|---|---|
| JAMES DANIEL HOBGOOD | Case No. 3:22cv079 |
| **Plaintiff(s)** | *(to be filled in by the Clerk's Office)* |
| (Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | Jury Trial: *(check one)* ☒ Yes ☐ No |
| -v- | |
| KARRIE BURLESS CLAYBROOK | |
| **Defendant(s)** | |
| (Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | |

## COMPLAINT FOR A CIVIL CASE

### I.    The Parties to This Complaint

#### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

RECEIVED
FEB - 8 2022
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| Name | HOBGOOD |
|---|---|
| Street Address | 45 MANAKIN FARMS DRIVE |
| City and County | MANAKIN SABOT |
| State and Zip Code | VA 23103 |
| Telephone Number | (804) 370-7829 |
| E-mail Address | HOBGOOD.DAN @ GMAIL.COM |

#### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

Name _____ KARRIE BURGESS CLAYBROOK _____

Job or Title *(if known)* _____ WHORE _____

Street Address _____ 611 SOUTH PROMENADE BOULEVARD _____

City and County _____ ROGERS _____

State and Zip Code _____ AR  72758 _____

Telephone Number _____

E-mail Address *(if known)* _____ clayb6008 @ GMAIL. COM _____

Defendant No. 2

Name _____

Job or Title *(if known)* _____

Street Address _____

City and County _____

State and Zip Code _____

Telephone Number _____

E-mail Address *(if known)* _____

Defendant No. 3

Name _____

Job or Title *(if known)* _____

Street Address _____

City and County _____

State and Zip Code _____

Telephone Number _____

E-mail Address *(if known)* _____

Defendant No. 4

Name _____

Job or Title *(if known)* _____

Street Address _____

City and County _____

State and Zip Code _____

Telephone Number _____

E-mail Address *(if known)* _____

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(check all that apply)*

☐ Federal question          ☒ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

### B.    If the Basis for Jurisdiction Is Diversity of Citizenship

1.    The Plaintiff(s)

    a.    If the plaintiff is an individual

The plaintiff, *(name)* _itsbers_ , is a citizen of the State of *(name)* _VA_ .

    b.    If the plaintiff is a corporation

The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ ,
and has its principal place of business in the State of *(name)* _____

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

    a.    If the defendant is an individual

The defendant, *(name)* _Leay snook_ , is a citizen of the State of *(name)* _AR_ . Or is a citizen of *(foreign nation)* _____

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

    b.    If the defendant is a corporation

        The defendant, *(name)* _____, is incorporated under

        the laws of the State of *(name)* _____, and has its

        principal place of business in the State of *(name)* _____.

        Or is incorporated under the laws of *(foreign nation)* _____,

        and has its principal place of business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

_____

## III.   Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

SEE COMPLAINT

## IV.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

_JtE    COMPLAINT_

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    _2/8/22_

Signature of Plaintiff    _____

Printed Name of Plaintiff    _DON HOSKOD_

### B.    For Attorneys

Date of signing:    _____

Signature of Attorney    _____

Printed Name of Attorney    _____

Bar Number    _____

Name of Law Firm    _____

Street Address    _____

State and Zip Code    _____

Telephone Number    _____

E-mail Address    _____

FILED

2022 FEB -8 A 10: 19

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

JAMES DANIEL HOBGOOD,         )
         Plaintiff,        )
                     )
vs.                     )
                     )
KARRIE BURGESS CLAYBROOK,     )
         Defendant.       )

### PLAINTIFF'S COMPLAINT WITH JURY DEMAND

I, the plaintiff, bring forth the following Defamation and Intentional Infliction of Emotional Distress Complaint against Defendant:

### INTRODUCTION

1.     I am a native and resident of Virginia. Thanks in no small part to Defendant Claybrook, my provided address in Manakin Sabot has been my permanent one since November of 2015.

2.     The defendant is a resident of Arkansas and is a corporate officer for Walmart. According to an Internet search, her physical address is 600 South Promenade Boulevard, Rogers, Arkansas 72758. Her work address, Walmart's "home office," is 702 Southwest 8th Street, Bentonville, Arkansas 72716.

### FACTUAL BACKGROUND

3.     In the summer of 2014, in my hometown of Richmond, Virginia, I met and started to date the present case's Defendant, a traveling corporate officer for the world's largest company, Walmart. Defendant presented herself as someone who was single

and interested only in a serious relationship that could lead to marriage. To these ends, we made a pact: that we would, in her words, "always be honest" with one another.

4.      Within a month of when we had met, Defendant and I had become sexually active. As usual, she took the initiative during the weekend visit when we consummated our relationship. She showed her intentions by beginning to undress me once we had retired to my bedroom; thereafter, she vigorously performed oral sex on me, positioned herself on top of me for vaginal intercourse, and fondled my sex organs to cause me to ejaculate. In addition, she spoke of an affinity for anal sex and her hope to tie me up to the bars of my bed, "S & M" style. (*Please* excuse these graphic details, which surely seem unnecessary at the moment. On account of Defendant, I promise you that, unfortunately, they soon will not.)

5.      In the aftermath of our relationship's consummation, Defendant, unprompted, said she knew enough about me to conclude that I indeed was the person she wanted to marry and have children with. Also, she volunteered to relocate to Richmond – because that was where all of my family lived, and because she could do her work anywhere that she had Internet access. Her overtures were best embodied by something she professed on the morning that we woke up in bed together: "All I want to do is make you happy."

6.      Upon mid-October 2014, Defendant planned to come stay with me for another romantic weekend. Alarmingly, she never showed up – and didn't communicate any reason why not that whole weekend. Because we had reconfirmed our rendezvous less than 24 hours before it was slated to commence, I was worried sick that something unpleasant had happened to Defendant. So worried was I that I barely

slept while she was MIA.  Worse, when I finally did manage to get some sleep, I broke a

tooth as a result of my unrelenting anxiety about Defendant's well-being.  This calamity

led to my first-ever root canal, the high cost of which took me months to pay for and the

lingering pain from which abated only in the last couple of years.

      7.    Almost one week after Defendant went missing, she sent me a sequence

of text messages to explain her absence.  Seemingly verifying that she had been the

victim of misfortune, Defendant wrote that "not hours before we were supposed to meet

up," her father had died.  Reaffirming her feelings for me, she expressed that she had

needed and would continue to need some time to grieve privately.  Quite saddened to

hear the news about her apparent family tragedy, I offered Defendant my sympathy and

remarked that I would look forward to seeing and hearing from her again in due course.

      8.    At the end of that same month of October 2014, I went out on the town in

Richmond to celebrate Halloween.  In doing so, I, much to my surprise, ran into

Defendant – who had not let me know that she was going to be in the area.  Seeing me

when I saw her, she excitedly rushed to greet, hug, and kiss me.  For my part, I was too

confused to be excited.  I didn't understand why she wouldn't have told the alleged man

of her dreams that she was going to be in his neck of the woods.  During the cordial

exchange that Defendant and I proceeded to have, I politely inquired why she hadn't

communicated to me that she was headed in my direction.  Accordingly, I also

questioned whether she was sure that she still wanted to be in a relationship with me.

Citing our pact to be honest with each other, I asserted that she could – and should –

tell me if she'd had a change of heart.  Rather than express any disinterest, Defendant

reemphasized – and even expounded on – her earlier overtures.

9. Still, I was uneasy – a sentiment that I conveyed to friends, some of whom basically were investigators at the law firm where I worked. A couple of these friends took upon themselves the task of conducting a more thorough background check than the average person would know how to conduct. The findings were, to say the least, concerning. Nowhere online, through any publication, was a notice of death or obituary for Defendant's father, Dwayne. More troubling, my friends told me of a man in Philadelphia, named Brandon Claybrook, whose profile on the social media network of Facebook identified him as Defendant's fiancé.

10. Almost immediately, I contacted Defendant about him. She swore to me that Claybrook was an ex-boyfriend and that he was presenting himself as her fiancé because he was obsessed with her and had not accepted that she wasn't interested in him any longer. Moreover, Defendant attested that Claybrook was "a dangerous person" and that I "[didn't] know what he is capable of." When I delicately asked Defendant why I hadn't been able to authenticate her father's death, she became outraged at the insinuation that she had lied about his demise. "How could you ever think I would make something like that up?!" she exclaimed, reminding me that she was "an honest person" who had promised I could depend on her to be. Her display of emotion was so convincing that I felt guilty for doubting her sincerity. Consequently, I apologized and asked for her forgiveness.

11. Nonetheless, I indicated I had been hurt to learn that she had come to Richmond to socialize with friends instead of to make up for lost time with me. Articulating to Defendant that I had chosen to be exclusive with her because of the seriousness of her avowed intentions, I informed her that our relationship needed to be

a priority if she wanted me to keep dating her.  Defendant claimed that she understood, and she promised me that the very next instance she was able to come to the area, she would do so to spend an overdue weekend with me.

12.    In the interim, while I waited for Defendant to honor her commitment, something very peculiar began to catch my notice.  As best as I could gather, I was being followed in the vicinity of my workplace on the outskirts of Richmond.  Initially, my hope had been that the perceived problem was nothing more than just that: perceived.  Yet, after I had repeatedly seen a couple of oversized SUVs slowly driving by me on the walk between my office and the thoroughfare where I parked my car, I stopped believing that the phenomenon was merely coincidental.  Who exactly the culprits were and for what reason they would be monitoring me I wasn't sure – but by the first week of December 2014, I was acutely aware of my immediate surroundings, in case I had to alert authorities.

13.    So, on the morning of Saturday, December 6, 2014, when I had to meet a colleague at work to complete a joint project, I was paying attention to anything out of the ordinary that I saw during my approach.  Defendant's car in the condominium parking lot adjacent to my firm certainly qualified.  Again: She had promised to notify me about her next visit to Richmond.  Regardless, there she was.  Playing dumb, I texted her as if by chance.  When I asked her where she was, she lied.  Thus, I revealed where *I* was and that I knew she was lying.  Once and for all, I inferred that Defendant was a con artist living a double life.  Presuming at this junction that she was romantically involved with *numerous* other people, I determined that she *is* somebody who could and would misrepresent her relationship status and make up a story that her father had died.

Really, she had fictionalized much, if not most, of what she had marketed about herself (her status at Walmart, her philosophic views, that she had been in a bad car crash shortly after we'd met, that she had survived a premature bout with breast cancer, etc.).

14.    Aghast, I told Defendant that, morally speaking, she owed me an apology and explanation.  Based on her assurances, I'd passed up other, no-longer-available relationship options.  Because of her duplicity, I had suffered physical and financial hardship.  In addition, she had put my life and health at risk without my consent; indeed, I never would have agreed to date Defendant – much less have sex with her – if I'd known that she was (supposed to be) in a committed relationship with another man.

15.    Defendant acted like she was impervious to shame (something I would realize in time that she for sure is immune to).  Suddenly, the woman who had promised she would always be honest with me was announcing that she "[had] never had a reason to be honest with [me]."  When she refused to show remorse for her actions, I was confident that they would continue.  Ergo, I contacted Brandon Claybrook and Walmart, so that I could warn them about Defendant.  As I did, I observed that Walmart even touted a policy encouraging individuals to report employees who were failing to abide by the standard of "personal and moral integrity" that founder Sam Walton advocated.  (Irrespective of this observation, I believed then and speculated to Walmart that Defendant, consistent with her modus operandi, could very well have been posing as one of the company's corporate officers altogether – a contingency perhaps more unsettling to the outfit than dereliction would be.)

16.    Within days of issuing my warnings, one of the same SUVs I had previously noticed at my workplace was on the street of my residence, as witnessed by

both my housemates and me.  For the first time, I was able to get a good look at its occupant, an older man who stared me down from the driver's seat.  Soon enough, I would uncover that the man was someone named Terry Godbolt.  What I established was that Defendant was operating as an (")escort(") in the Richmond area and that Godbolt was one of her clients.  Before December 6, 2014, Defendant had already recruited Godbolt to monitor me, disclosing my identity and whereabouts to him.  (If not for her, Godbolt wouldn't have meaningfully known who I was.)  After December 6, 2014, Defendant sought not just to monitor me, but also to make me as uncomfortable as possible – hoping that she could scare me into silent submission.  Aside from continuing to loiter around my workplace, she decided to dispatch Godbolt to my domicile.  Given the escalation of Defendant's tactics, I concluded that the time had come for me to approach law enforcement.

17.    I wouldn't have to, however.  Mere hours after I had spotted Terry Godbolt's SUV at my home, Richmond Police came to the address looking for *me*.  Further aiming to complicate my life, Defendant had chosen to levy false criminal allegations against yours truly.  She alleged that she had received threats from me and that *I* had been following *her*.  Preposterously, she tried to claim that she had no idea who I was, that she'd never dated me, and that she'd never been to my house.  Also dishonestly, she denied that she was moonlighting as an adult entertainer/stripper.

18.    Once I had helped Richmond detectives validate the truth, they stopped cooperating with Defendant – and apologized to me for their premature rush to judgment.  As a consequence, Defendant approached local police in Northwest Arkansas, where she had moved in early 2015 to advance her career at Walmart (her

bona fide place of employment, the record showed).  Amazingly, her fish story grew

more ludicrous.  Beyond denying that she had been romantically associated with me,

Defendant insisted that instead of authoring the amorous text messages she'd sent my

way, I had somehow used computer technology to manufacture them.  Similar to

Richmond Police, local authorities in Arkansas considered Defendant unreliable and

ultimately refused to do her bidding.

      19.    Not to be deterred, Defendant then approached federal authorities

stationed in her home state.  Sensing that she had a particularly impressionable

audience this go-round, she shamelessly seized an opportunity to concoct her most

ambitious lie of all: Instead of recounting that she'd consented to intercourse with me,

and that she'd performed the sex acts on and with me that she did (as well as gushing

that she desired to perform others), she alleged that she had been the victim of date

rape.  Defendant claimed that before meeting me for dinner on the fall night in 2014 I

have previously described, I sent her "a series of text messages," in which I asked

whether she wanted me to "order . . . her [a] drink" for when she arrived.  According to

Defendant, she "requested an iced tea," that, upon her appearance, was "waiting for

her."  "Approximately 45 minutes into [her] encounter" with me, Defendant attested that

she began to feel "ill" and that I "urged her to come to [my] home."  *Another* 45 minutes

after Defendant said that she first started to feel ill, she stated that she left the

restaurant to go to my residence – driving her car.  Conceding that we shared a kiss on

my bed, Defendant nevertheless avowed that, as if by magic, she "[could] not recall

anything else that happened that evening."  Waking up the next morning, she "was no

longer wearing a tampon" that, "because she had had her period," she "naturally would

not have slept without . . . especially since [my bed's sheets were] white." Defendant indicated that because she realized she'd been assaulted, she "made up an excuse to leave [my] residence." The implication was that, afterward, she never had any more interaction with me.

20.      Except – she did.  Not an hour following her departure – that is, within an hour of supposedly realizing that she had been raped – Defendant was affectionately corresponding with me. This only intensified subsequently, as she kept calling and texting to express how much she missed being in my presence when she was not ("more than [I could] know," in fact). Additionally, she alluded to her fondness for the physical intimacy between us, even though she would have had to be unconscious for it, based on her allegation of date rape. The following week, when she said that she had to travel to Costa Rica on assignment for Walmart, she encouraged me to remain in contact by email and reiterated, repeatedly, that she missed me. We proceeded to exchange emails back and forth until what I presumed was her return stateside, and then we resumed talking by phone, typically at considerable length. (As our telephone records would confirm, incidentally, most of these calls were *from* Defendant *to* me.) Around this time, Defendant described me as "an amazing person" and as someone who had been "nothing but understanding." One cannot help but think that if she had been raped, she would have supplied a much different assessment – assuming that she would have been communicating with me at all.

21.      Defendant's account fails to withstand scrutiny in other ways too. *How was she able to drive to my house if she'd been drugged – almost two hours beforehand?* (Answer: Defendant was able to drive because she hadn't been drugged.

Besides that, she hadn't had an iced tea to drink at the restaurant, she didn't find one waiting for her when she arrived, she didn't request one prior to when she arrived, and I never solicited a drink order from her prior to when she arrived.) *Why on earth would Defendant go to my residence if she was beginning to feel ill and suspect me of foul play?* (Answer: Defendant went to my residence because, in reality, she was feeling well – *very* well.) *Assuming Defendant had been menstruating and that I* had *violated her, wouldn't my aforementioned sheets have been red with blood when she woke up?* (Answer: The sheets weren't bloody because Defendant clearly wasn't on her period; not only wasn't she wearing a tampon the night before, but she also wasn't wearing underwear either.)

22.     Defendant's lack of credibility becomes more apparent with the knowledge that both of my housemates, Mary Jenczewski and Tyrell Miles, were home for her overnight stay and affirm that she was lying about what happened.  (See "Exhibit A.") They have confided that Defendant was audible beyond the walls of my room well into the evening.  Furthermore, these cohabitants have verified that when Defendant left the house that weekend, she grabbed and kissed me goodbye at the main entrance – behavior consistent with what she exhibited in front of a crowd of people later that month on Halloween.

23.     Consequently realizing that Defendant was *in*credible, the federal agents who had come to her aid didn't want to have to concede that they'd wasted time, energy, and taxpayer money on a wild goose chase.  To evade corresponding embarrassment, they scoured for an "offense" that they could prosecute me for – finding one that I'd never heard of, although I am a law school graduate: something

preposterously called "cyberstalking." I had "cyberstalked" Defendant, the government purported, because I'd circulated the truth about her and sought an apology for the heinous lies that she'd told to and about me. Importantly, I had never engaged in the type of behavior that is ordinarily prerequisite for a stalking (or even "cyberstalking") charge: I hadn't threatened Defendant (much less physically confronted her against her will), I hadn't been following her, I hadn't defamed her, I hadn't distributed private/sexually explicit photographs of her (AKA "revenge porn"), etc. Again: I had publicized the truth about her, to warn others to steer clear of a dangerous con-artist, and I had sought an apology from her, on account of her misrepresentations. That's it. Simply put: *Consistent with individual rights and justice (the ideas on which America is based), I did nothing antecedently or disproportionately adverse.*

24.     In early 2016, the criminal case against me remained on course for trial in Arkansas. At trial, thanks to outrageously indiscriminate sentencing guidelines, an unfavorable verdict would have begat a term in federal prison exceeding several *years*. To avoid that fate, I would have had to rely on random jurors off of the street, technically "peers" though thousands of miles away from my home base, to exercise better judgment than the alleged legal professionals with whom I had dealt. Afraid to bet my future on that tenuous prospect, I canceled the forthcoming trial by begrudgingly consenting to a plea deal. Via the deal, (1) the government would recommend a sentence solely of probation, (2) I would not have to admit to the opposition's contended "facts" (almost all of which *weren't* factual), and (3) I would maintain my innocence as a matter of law – and correspondingly, the ability to appeal my "cyberstalking" conviction.

25.     My sentencing for "cyberstalking" took place on September 12, 2016.  The present case's Defendant came to address the court – but would not be compelled to do so under oath.  Trying to justify that I should have to pay for her relocation to a second apartment in Northwest Arkansas, Defendant claimed that I had sent correspondence and dispatched people to her initial apartment in the area – though, even without having to submit to cross-examination, she nervously yielded that she had no proof to substantiate these beliefs.  For the record: *When* did Defendant say that she had to move because she was afraid of me?  December of 2015 – one month after I was already on electronically monitored, pretrial house arrest at my parents' home in Virginia.  *Where*, meanwhile, did Defendant say that she had to move?  *Up a floor* – to a bigger space in the same apartment complex in which she was already living and that she said I was aware of.  Again, to *reiterate* for the record: I had never threatened or stalked Defendant whatsoever.  On the contrary, I had repeatedly assured both her and her family that I was a "man of peace" who would do "nothing illegal or immoral."

26.     One such time that I communicated my peaceful intentions was when I wrote a long message to Defendant's father on Facebook.  As Burgess addressed the court, she criticized me for having sent him this particular message, in which I expressed my dismay about how she had deceitfully seduced me – including sexually.  Defendant implied that I had sent this message to her father without provocation, just to annoy him.  What she *didn't* mention, customarily, is that my restrained message was in response to a threatening one of his, the text of which is was follows:

> [You're] not hard to find[,] so just leave us alone.  Family is family[,] and [you're] a
> common piece of shit that can easily be flushed.  You don't know me[,] and[,] trust me[,] I
> know your type.  Pussy and a keyboard.  Step up and be a man[,] or continue to be the

weasel your parents know you are.  Have a nice day [–] because remember [that] my words become reality.

27.    Although I hadn't stalked Defendant, she, while on the witness stand, nevertheless tried once more to suggest that I had.  She asserted that on a trip to Richmond she made after the dissolution of our relationship, I had "called her as soon as [she] got off the highway" in town.  She said she didn't understand how I could have known that she had "just [come to Richmond] randomly," given that she "hadn't told anyone."  Frustratingly, though, Defendant was continuing to pervert the truth.  I did not contact her as soon as she exited any highway, but a few hundred yards from my then-workplace, which as I was driving toward, I came upon *her* driving toward and again in the vicinity of – despite its fairly isolated location *away* from Richmond's population.  So, Defendant was right to believe that our encounter was no "coincidence" – because *she* was deliberately going where I spent more time than anywhere else, a place where she was *bound* to find me.

28.    During her monologue, Defendant also indicated that she wanted to "clari[fy]" her allegation of sexual assault.  Despite working as a writer for many years, I can't for the life of me think of a way to summarize her remarks in the abstract.  Here, thus, is the text of what she had to say:

> [I]n my impact statement, you know, I wrote I didn't experience any physical, I guess, you know, of any type of – I had emotional damage, no physical damage.  And I know that seems weird considering what was written in there about, you know, the allegations of sexual abuse and so I wanted to kind of bring some clarity to that for you.  In my life I have experienced sexual abuse before as a child, and it's a lot of what led me to being a dancer in the first place because I had such a difficult time interacting, you know, with the opposite sex, and I wanted to be in a situation where I was in control of that interaction

and that's, you know, what dancing allowed me to do.  And I think it's just like when you've experienced that before and you know you can't prove it, I mean, the physical – I don't even look at that as a pain anymore, you know.  It's just the emotional pain of dealing with that you, you know, might have been the cause of that action.  You know, maybe you put yourself in the wrong situation.  And really just the helplessness of not being able to get true justice for that or actually prove that that's happened, you know, and just having to kind of live with that forever.  So I just wanted to bring some clarity to that as well.

29.     *Clarity?*  The lone excerpt of value from the foregoing, otherwise incoherent statement was Defendant's (Freudian?) confession that she intended to exert control over me (and other men) all along.  Of course, if she had been interested in offering *real* clarity about her sexual assault allegation, she would've had to admit that the accusation is 100% false.  This is something that I can omnisciently attest – *and that the facts attest too*.  Rather astoundingly, Defendant herself even acknowledged the truth – by way of another, revealing confession she made during her meandering speech: that "[I know] not to [and don't] quote/unquote break the law."

30.     After nearly 45 minutes of talking, almost entirely without interruption, Defendant concluded the speech she had haphazardly delivered by defiantly proclaiming her innocence.  "I've done absolutely nothing wrong," she boldly declared – as she also declared that the only apology she owed anybody was to *herself*.  Furthermore, she encouraged the individual presiding over my case, U.S. District Court Judge Timothy Brooks, to ignore the terms of my plea agreement and send me to prison.

31.     Brooks would do just that.  Stating that he "happen[ed] to agree with what [my accuser had to say]," Brooks labeled me a "privileged [white male]" and avowed

that I "deserve to be a convicted felon" and sentenced me to a year in prison. In the meantime, he exalted the present case's Defendant as a "real victim" and not only let her enter and leave the courthouse as free as a bird but also awarded her the thousands of dollars she was seeking from me (enrichment she likely had been hoping to gain since the very night we met).

32.     This September 2016 sentencing hearing marked the last time that I have seen the current Defendant. Besides professing her innocence and apologizing to herself at the climax of her epic speech, she reserved a moment to "thank" me for helping her achieve some sort of self-realization. I would have been more convinced that she had evolved as (into?) a human being if what she'd done, instead of sarcastically expressing gratitude, was accept responsibility for her conduct and proffer the apology she'd long withheld. Though too little and too late to reverse the damage inflicted, that act on her part would have been evidence of *genuine* maturation and awareness — because, goodness knows, her "honest" endeavor "to make [me] happy" turned out to be anything but what she had advertised.


## STANDARD OF REVIEW

33.     To prove *prima facie* defamation, a plaintiff must show: (1) that the defendant(s) represented at least one false statement as factual, (2) that the defendant(s) published/communicated the falsehood(s) to at least one third party, (3) that the publicity was at least negligent, and (4) that damage resulted to the plaintiff as a result. To bring a defamation lawsuit in federal court, diversity of citizenship must exist between plaintiff and defendant, and the amount in controversy must exceed $75,000.

Venue is appropriate where the defendant resides, the offensive conduct occurred, and/or the defendant otherwise is subject to personal jurisdiction (because of conducting business in the location, for instance). In the federal system, district courts adopt the statute of limitation rules of whichever state in which they are located. Ergo, the limit for a plaintiff to file suit for defamation in the Eastern District of Virginia is generally one year from the time of the most recent instance of offensive conduct. Yet, if, for instance, a plaintiff was legally incapable of pursuing redress until after the one-year time limit has expired, the clock does not start to run until he has legal capacity to bring suit.

## DEFENDANT'S FALSE CLAIMS

34.     In list form, here are Defendant's principal misrepresentations about me and our prior relationship (or at least the ones of which I am aware):

(1) That she didn't know who I am
(2) That I had lied when claiming she was an "exotic dancer" (i.e., a stripper)
(3) That I had lied when claiming we had been romantically involved
(4) That she had never been to my residence
(5) That I had lied when claiming we had had sexual intercourse
(6) That I was stalking her
(7) That I had tracked her whereabouts using some sort of device attached to her automobile
(8) That I had used computer technology to manufacture text messages and then attribute them to her
(9) That I was directing people to visit her residence in Arkansas and that she was receiving handwritten correspondence there that matched my handwriting
(10) That she maybe did have sex with me, but only because she thinks that she had been sexually assaulted (!)

35.    Defendant has herself already conceded that several of these assertions were, in fact, lies.  Evidence, logic, and testimony affirm that the rest of her assertions are untrue too.  Undeniably, Defendant has a sincere credibility problem.  A testament to this is a 2009 felony charge that I have discovered she faced in Virginia, for the commission of fraud.  (See "Exhibit B.")

## DEFENDANT'S COMMUNICATION OF FALSE CLAIMS

36.    Defendant told her lies to people in our social circle and various members of law enforcement.  She even lied from a witness stand in an open session of federal court that numerous members of the public attended.

## DEFENDANT'S MALICE

37.    Defendant communicated her false claims despite knowing that they were false, as evidence, logic, and testimony have attested and will attest.

## DAMAGE CAUSED

38.    My life is in shambles because of what Defendant has done.  Her lies robbed me of my very liberty – *for years*.  Accordingly, I would lose contact with many loved ones, some of whom were in failing health and proceeded to die.  To those dearly departed loved ones, I never got to say goodbye.  During my period in custody, I was subject to physical and verbal abuse, from fellow inmates and staff respectively.  In numerous instances, serious medical conditions went untreated, leaving me in need of

otherwise-avoidable surgery *and* ailments that, despite great expense, linger to this day – and may always.  (See "Exhibit C" and "Exhibit D.")  Once a champion athlete who trained by running 12 miles almost every day, I can't even run 12 yards nowadays without pain.  Worse still, I lost the house that I called home for longer than a decade; the means by which to earn a decent, sustainable living; a substantial degree of intensely personal privacy; and the status I'd tirelessly worked to attain in my community.  Always having taken great pride in my name and family heritage, I currently go to considerable lengths to obscure my identity.  For close to half a decade now, I haven't been able to introduce myself by my full name to anybody whom I meet, for fear that the person will "Google" me and be repelled as a result of the unbecoming (mis)information encountered.  Accordingly, I have ceased using my last name on social media, and I have even seriously considered changing my name legally.  The prospect of doing so has caused me significant despair and mental anguish.  I had worked so hard, for my entire life, to earn a good reputation for the name that my parents gave me.  All of that work – suddenly was for naught.

## APPROPRIATE JURISDICTION AND VENUE

39.     Complete diversity of citizenship exists between Defendant and me.  The amount in controversy, as one shall soon see, exceeds $75,000.  Venue is appropriate because the Defendant's offensive conduct occurred, in large part, in the Eastern District of Virginia.

## STATUTE OF LIMITATIONS

40.    Aside from unjustly sending me to prison, the "Honorable" Judge Brooks ordered that I could not contact Defendant – directly or indirectly – through a period of probation lasting until the beginning of 2021.  Consequently, I argue that Virginia's one-year statute of limitation for defamation suits did not begin to run until this year.  Before then, I, however improperly, was legally incapacitated.  Had I tried to file suit previously, which would have required that I contact Defendant indirectly through service, Brooks surely would have further persecuted me, by revoking my supervised release and sending me back to prison.  Hence, even at the present time, the Court in Virginia should allow my suit to proceed forward.  Quite simply: Dismissing it would be an affront to the very justice that, according to the Constitution's *very first sentence*, is our government's objective.  For years, because of most-undeserved circumstances, I was powerless to hold Defendant accountable for her wicked deeds.

## CONCLUSION

Wherefore, I respectfully request that judgment be entered against Defendant for substantial compensatory damages in an amount not less than Fifty Million Dollars ($50,000,000); that the Court enter judgment against Defendant for punitive damages in an amount not less than Four Hundred Million Dollars ($400,000,000); that the Court charge all costs of this action to Defendant; and that the Court grant all such other and further relief as deemed appropriate, including a referral for criminal prosecution. (Incidentally: My financial requests are consistent with other recent, comparable defamation lawsuits in federal court.)

Thank you for your prompt attention to this sobering matter.


Submitted on this 8th day of February 2022,


_____
Dan Hobgood
49 Manakin Parke Drive
Manakin Sabot, Virginia 23103
(804) 370-3829

Plaintiff